**UNITED STATES of America**

v.

**Morton SOBELL.**

United States District Court
S. D. New York.

June 20, 1956.

See also 109 F.Supp. 381.

516

Paul W. Williams, U. S. Atty., and Robert Kirtland and Maurice N. Nessen, Asst. U. S. Attys., New York City, for the Government.

Donner, Kinoy & Perlin, New York City, Frank J. Donner, Arthur Kinoy, Marshall Perlin, New York City, Benjamin Dreyfus, San Francisco, Cal., and Luis Sanchez Ponton, Mexico City, Mexico, of counsel, for petitioner Morton Sobell.

IRVING R. KAUFMAN, District Judge.

On March 29, 1951, a jury of eleven men and one woman found Morton Sobell guilty of conspiring to commit espionage by transmitting to the Soviet Union, intended for its benefit, "documents, writings, sketches, notes and information relating to the national defense of the United States." Their verdict was returned at the end of an exhaustive trial, at which Sobell's two extremely able attorneys and the able lawyers of his co-defendants, Julius and Ethel Rosenberg, skillfully but vainly tried to stem the avalanche of evidence against them. The trial was held in a manner which impelled the defense attorneys to compliment the Court for its fairness and courtesies on three separate occasions, and to state that the trial had been conducted "with that dignity and that decorum that befits an American trial."[1]

Now five years later, Morton Sobell has petitioned this Court pursuant to 28 U.S.C. § 2255 to set aside this verdict and judgment, alleging that his constitutional rights have been violated and that the court was without jurisdiction to try him. The contentions now raised by Sobell relate to procedural and constitutional issues which do not go to the question of his guilt or innocence. Even if every one of the contentions now raised by petitioner was to be sustained, it would not follow that he is innocent.[2]

1. At the start of his summation, Mr. E. H. Bloch stated: "I would like to say to the Court on behalf of all defense counsel that we feel that you have treated us with the utmost courtesy, that you have extended to us the privileges that we expect as lawyers, and despite any disagreements we may have had with the Court on questions of law, we feel that the trial has been conducted and we hope we have contributed our share, with that dignity and that decorum that befits an American trial." (Printed Record, pp. 1452–1453, hereafter R. 1452–53.)

After the verdict of guilty was returned against all defendants, the same counsel was moved to say the following: "Mr. E. H. Bloch: I would like to restate what I said when I opened to the jury. I want to extend my appreciation to the Court for its courtesies, and again I repeat I want to extend my appreciation for the courtesies extended to me by Mr. Saypol and the members of his staff, as well as the members of the FBI, and I would like to say to the jury that a lawyer does not always win a case; all that a lawyer expects is a jury to decide a case on the evidence with mature deliberation. I feel satisfied by reason of the length of time that you took for your deliberations, as well as the questions asked during the course of your deliberations that you examined very carefully the evidence and came to a certain conclusion." (R. 1583.)

Even at the time of sentencing, counsel said: "Mr. E. H. Bloch: * * * I believe that in this posture of the case, in retrospect, we can all say that we attempted to have this case tried as we expect criminal cases to be tried in this country; we tried to keep out extraneous issues; we tried to conduct ourselves as lawyers, and I know that the Court conducted itself as an American judge." R. 1603.

2. Although the question of a petitioner's guilt or innocence is almost never ma-

Former Judicial Proceedings
In This Case

The convictions of Sobell and his co-defendants were affirmed by the Court of Appeals for the Second Circuit in a detailed opinion which contained the following language:

"Since two of the defendants must be put to death if the judgment stand, it goes without saying that we have scrutinized the record with extraordinary care to see whether it contains any of the errors asserted on this appeal." United States v. Rosenberg, 2 Cir., 1952, 195 F.2d 583, 590.

Thereafter, defendants filed a petition for a writ of certiorari to the United States Supreme Court, and this was denied. 344 U.S. 838, 73 S.Ct. 21, 97 L.Ed. 652. In the following two years, Sobell participated in two motions brought under Section 2255 of the Judicial Code, each seeking to vacate the judgment on constitutional grounds; both motions were found to be without merit and were denied in the District Court. United States v. Rosenberg, 108 F.Supp. 798. The denials were affirmed on appeal by the Court of Appeals, 2 Cir., 200 F.2d 666, and a petition for a writ of certiorari filed after the first motion, was denied by the Supreme Court. Sobell v. United States, 345 U.S. 965, 73 S.Ct. 951, 97 L.Ed. 1383. After almost every one of the above decisions, petitions for rehearing were also considered and denied. 345 U.S. 1003, 73 S.Ct. 1131, 97 L.Ed. 1408; 347 U.S. 1021, 74 S.Ct. 860, 98 L.Ed. 1142. In addition, numerous applications for relief were made by the Rosenbergs, and although Sobell did not join in them, it is worth noting that none

of the attacks on the judgment was sustained.

This then is the background against which petitioner makes his present allegations and accusations of infringement of his constitutional rights. The record shows that in one form or another the case was before the United States Court of Appeals six times, always concluding with an affirmance, and before the United States Supreme Court six times on applications of one sort or another, always ending with the conviction remaining undisturbed, and this tally does not include the numerous proceedings at the District Court level and the various applications to other judges of the District Court.

Sobell's Present Contentions

The basic factual allegations set forth in Sobell's moving papers are not new to this Court. Indeed, they were first raised five days after the verdict on a motion in arrest of judgment. The denial of that motion was specifically affirmed on Sobell's initial appeal to the Court of Appeals, and it was set forth as one of the grounds supporting his prayer for reversal in the defendant's first petition for certiorari to the Supreme Court, which was denied. He argues, however, that although certain of these allegations have been made before, the legal consequences now urged as stemming from them have not been previously considered.

Despite the lack of novelty in petitioner's present assertions, and despite the numerous hearings he has been accorded, the Court has again painstakingly re-examined the record in the light of his instant allegations. Such is the way in which a democratic society ad-

terial in a motion pursuant to Section 2255, I feel constrained to make this point clear, in light of the publicity which has been attendant upon this case over the years.

The finding of Sobell's guilt resulted from the collective and unanimous judgment of twelve conscientious jurors, who had an opportunity to observe the witnesses while they testified and thus ad-

judge their credibility. The importance of this opportunity to see and hear witnesses as they testify has been attested to time and again by our appellate courts. It is clear, therefore, that this so-called demeanor evidence is of prime importance and that those who have attempted to adjudge the credibility of the witnesses in this case without having observed them testify are proceeding on tenuous ground.

ministers justice—carefully, meticulously, and even repetitiously—lest an error go undetected. Under our judicial system we impose a strong check upon the manner in which a prosecution may be conducted.

It is difficult to find a case in the history of American jurisprudence, or indeed in the judicial annals of any other country, where the defendants' convictions and contentions have received the attention of so many judges at so many levels of a judicial system, as well as that of the President of the United States on applications for executive clemency. Not a single legal recourse has been or will be denied to Sobell.

In his present petition, Sobell avers that he was kidnapped from Mexico by agents of the Mexican Secret Police who were acting under the orders of the FBI, and that he was thus forcibly and illegally returned to the United States against his will. He does not assert, however, that this alleged abduction deprived this court of any jurisdiction over his person. On the contrary, he not only concedes that he waived any such claim (assuming he would have had one) but he also asserts that he would have returned willingly to stand trial.

The first argument he now makes concerning this so-called abduction is that it denied him the opportunity to return to the United States willingly, and that it was staged for the sole purpose of permitting the prosecution to represent to the jury that Sobell was a fugitive from justice. He asserts that when the government introduced evidence to show that he had been "deported" from Mexico, this was subornation of perjury on the part of the prosecutors, as they then well knew that Sobell had not been deported in accordance with established Mexican procedures. He alleges further that the government deliberately suppressed evidence relating to this abduction and made misrepresentations to the Court about it—and that any one of these alleged improprieties, if established, would show a deprivation of petitioner's constitutional rights.

His second attack, set forth in a separate motion under Section 2255, is that this alleged kidnapping violated a treaty between the United States and Mexico. He argues that since this extradition treaty is the law of the land, its violation deprived the courts of this country of jurisdiction over the subject matter of this offense. Since, unlike jurisdiction over the person, lack of jurisdiction over the subject matter cannot be waived by a defendant, Sobell claims that this defect vitiated the entire trial, and that his conviction is a nullity.

### The Law Governing Motions Pursuant To Section 2255

Section 2255 of the Judicial Code permits a convicted prisoner to move to set aside the sentence if it was imposed in violation of the Constitution or laws of the United States, or if the sentencing court was without jurisdiction to impose that sentence. The court then has a duty to order a prompt hearing upon the petitioner's allegations "unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief."

In opposing the instant motions, the government has taken the position that Sobell's factual allegations regarding the prosecution's misconduct during the proceedings are completely contrary to the record, and that his legal arguments stemming from the allegations of his kidnapping are totally devoid of merit. In short, the government urges that Sobell's present allegations furnish no basis for vacating his conviction either because of violation of his constitutional rights or because this court was without jurisdiction to try him, and thus no hearing on their veracity is necessary. In passing on these motions, therefore, the Court is required to accept all of petitioner's averments as true insofar as they are not inconsistent with the record. Pelley v. United States, 7 Cir., 214 F.2d 597, certiorari denied 1954, 348 U.S. 915, 75 S.Ct. 296, 99 L.Ed. 718; United States v. Sturm, 7 Cir., 180

F.2d 413, certiorari denied 1950, 339 U.S. 986, 70 S.Ct. 1008, 94 L.Ed. 1388.

Basically, the petitioner's allegations are that he and his family went to Mexico City in the spring of 1950, where they resided openly and under their own name. On the night of August 16, 1950, he says agents of the Mexican Secret Police entered the Sobell apartment there and arrested him without a warrant. When he tried to resist, he adds, they beat him into unconsciousness and took him to an unidentified building where he was detained overnight—held completely incommunicado. The next day, he continues, he was forced to enter an auto with several of these agents, and they drove towards the border, stopping occasionally for the agents to make telephone calls—presumably with regard to Sobell. When he reached the border bridge, a United States agent entered the car—though still on Mexican territory—and he rode with them to the U. S. Customs Office. There Sobell found that his wife and children had also been brought back. He was "directed to sign a card", he says, and after his baggage was searched he was placed under arrest and taken to jail. He avers that this whole abduction was in violation of Mexican law and that the Mexican Secret Police had no legal authority to treat him in this fashion;—he charges that they were merely acting as agents of the Federal Bureau of Investigation. He further avers that at the time of his seizure

he had been planning to return to the United States—his trip being but a vacation jaunt—and this abduction prevented him from returning voluntarily.

With reference to his motion challenging the court's jurisdiction to try him, Sobell makes the further allegation that his expulsion was in violation of the Treaty of Extradition between the United States of America and the United States of Mexico. 31 Stat. 1818. It is upon this last allegation that he bases his argument that this court was without jurisdiction to try him. I shall deal with that contention first.

## Motion I
### Sobell's Contention That This Court Lacked Jurisdiction To Try Him

It is Sobell's position that the United States breached the extradition treaty with Mexico in two ways; first, because the offense with which he was charged was not among those enumerated in the treaty as extraditable[3], and, second, because the manner of this removal from Mexico "flouted the treaty requirements for specified official removal arrangements with duly constituted authorities of the Government of Mexico and for proceedings under Mexican law to determine probable guilt and justification for removal." Petitioner's Second Memorandum, p. 22. These two facts, he charges, operate to invalidate the subsequent proceedings against him, because "[a]n existing extradition treaty fully

3. Actually this first allegation is two-pronged: his first assertion is that espionage was not one of the crimes listed in the treaty and this is certainly true—although the conclusions he draws from that fact are incorrect. His second is that the treaty specifically excludes political offenses and he claims his was a political offense. This latter contention is, of course, completely meritless. Sobell was charged with and tried for conspiracy to commit espionage—a nonpolitical crime. The fact that he was a Communist was introduced to show motive for the crime, because unless some reason for his actions were shown, such as devotion to the cause of the Soviet Union, it would be difficult to understand why an American would thus spy upon

his country for the benefit of the Soviet. And the fact that Sobell and Elitcher were associated in this case also gave probative weight to Elitcher's story that he was approached several times by Rosenberg and Sobell to join their conspiracy; the fact that he was in sympathy with their ultimate cause undoubtedly was what impelled the defendants to trust Elitcher not to divulge their machinations despite his own decision not to take an active role. The jury was specifically and continually warned that Sobell was not being tried for Communism, and I might point out that the jury which was selected was one with which the defense indicated satisfaction before they had used up all their peremptory challenges.

controls the national power to conduct criminal proceedings involving alleged fugitives found in another treaty country. Absent treaty compliance, the power of the nation—and thus of its judiciary—fails *ab initio*." Petitioner's Second Memorandum, pp. 11–12. Further, Sobell contends, this lack of judicial power is not merely lack of jurisdiction over the person of the accused who has thus been wrongfully seized, it is total lack of judicial power over the subject matter of the offense.

This final argument defining the type of jurisdictional defect is vitally necessary to petitioner here, as concededly, any question as to the trial court's jurisdiction over his person was voluntarily waived by him, and the court's jurisdiction over his person has been specifically upheld by the Court of Appeals. Indeed, defense counsel stated on oral argument of this motion: "I am not here urging the matter of personal jurisdiction of the defendant. * * * That was litigated * * * and Judge Frank said they raised that too late and * * * it had been waived. Your Honor, if we were dealing with the matter of personal jurisdiction, we are out of court." (Transcript of Oral Argument, p. 34—hereafter T. 34.)

Accepting defense counsel's assertion, I find that this motion is raising the precise issue of personal jurisdiction, and that on that score alone, to paraphrase, Sobell is "out of court". Further, even assuming the jurisdictional question could be reached, I find that there was no violation of any treaty, that Sobell has no standing to raise this question and that the court properly had jurisdiction of his person.

## A. This Is A Question Of Personal Jurisdiction

The entire question of the effect of this alleged kidnapping upon the legality of Sobell's trial was first raised by the defense by a motion in arrest of judgment made five days after the trial, at which time they submitted an affidavit setting forth the circumstances of So-

bell's seizure. The motion was denied on the ground that if these facts existed, they were admittedly within the knowledge of defendant and his attorneys before and during the trial, and that the defense had made a deliberate decision not to call them to the court's attention. (R.1590–1595.)

On appeal to the Court of Appeals, the question of the trial court's jurisdiction over Sobell was specifically argued in defendant's brief which cited United States v. Rauscher, 1886, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425, and Cook v. United States, 1933, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641, the two cases chiefly relied on in the present motion. Their contentions were rejected. Speaking through Judge Frank, the Court stated:

"Sobell waived his right to challenge personal jurisdiction in this trial. * * * [H]e made no move to bring to light the facts of his alleged illegal abduction. He preferred to take his chances on the verdict, withholding his trump card until the trial was over. The Federal Rules of Criminal Procedure [18 U.S.C.A.] allow no such tactic." United States v. Rosenberg, 2 Cir., 195 F.2d 583, 603, certiorari denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, rehearing denied 1952, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 687.

Despite that flat statement, the defendants contend that they are free to raise this question again because they now allege that this abduction deprived the Court of jurisdiction over the subject matter, and the Court of Appeals has not considered that point. It is difficult to see how counsel can make that argument in good faith in light of the fact that a court is duty bound to raise the question of jurisdiction over the subject matter on its own motion, even if the issue is not placed before it, e. g., Defiance Water Co. v. City of Defiance, 1903, 191 U.S. 184, 24 S.Ct. 63, 48 L.Ed. 140; United States v. Bradford, 2 Cir., 194 F.2d 197, certiorari denied 1952, 343 U.S. 979, 72 S.Ct. 1079, 96 L.Ed. 1371,

and here the operative facts and chief cases were brought to the Court's attention.[4] The contention that three extremely able and experienced judges—Chief Judge Swan and Judges Chase and Frank—did not consider this point because petitioner used the label "personal" jurisdiction, is not only an insult to their intelligence but it completely ignores the Court's specific statement that "[u]nder Rule 34, motions in arrest of judgment are allowed only (1) where the indictment charges no offense and (2) *where the court had no jurisdiction over the offense charged. This situation, we think, falls into neither category.*" 195 F.2d at page 603. (Emphasis supplied.)

Further, Sobell's counsel concede that there would have been no question of the court's power to try Sobell for the offenses charged had it not been for the manner of his apprehension. (T.95.) Thus by counsel's own admission the only lack of power was that over Sobell's person, and the rule is clear that in a criminal case a court has jurisdiction of the subject matter if it has jurisdiction of the crime charged. Moreover, without exception, every single case which petitioner cites to uphold his position makes it patently clear that the jurisdictional question involved in all cases of irregular seizure of fugitives is the question of jurisdiction over the person of the defendant.[5] In the Cook case, upon which defense relies so heavily, jurisdiction over a "person" was not involved as the case concerned the court's jurisdiction to forfeit a British vessel, illegally seized on the high seas, and it was clear that the sole question was the court's power over the specific vessel.[6] Further, in every one of the cases where relief was granted, the jurisdictional issue was timely raised.[7] Indeed in the case of Ford v. United States, 1927, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793—a case on all fours with Cook—petitioners were denied relief because the jurisdictional question had not been raised on time. It is apparent, therefore, that no jurisdictional question other than that of personal jurisdiction was raised by the problem of irregular seizure, or else the Court would not have found a waiver.

It is clear that petitioner's present argument re jurisdiction is but a twice-told tale in new semantic guise. He seems to believe that by the mere device of changing attorneys and relabeling his claims, he may return to court time after time with the same basic argument. The petitioner speaks of justice, " '(b)ut justice though due to the accused, is due to the accuser also' ",[8] and it is due also to the Court which in its role of defender of justice must conscientiously wade through the voluminous briefs, affidavits and cited materials seeking merit in a contention so devoid in legal basis as to make its presentation tantamount to an abuse of process.

4. Indeed, both Sobell's brief on appeal and his petition for writ of certiorari set forth substantially the same arguments he now raises. Moreover, in his petition for certiorari, the allegedly misleading "personal" label was dropped from his discussion of the jurisdictional problems raised by the alleged kidnapping.

5. Johnson v. Browne, 1907, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816; Cosgrove v. Winney, 1899, 174 U.S. 64, 19 S.Ct. 598, 43 L.Ed. 897; United States v. Rauscher, 1886, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425; United States ex 'rel. Donnelly v. Mulligan, 2 Cir., 1934, 74 F. 2d 220; United States v. Ferris, D.C. N.D.Cal.1927, 19 F.2d 925.

All the other cases cited in petitioner's brief similarly point up the fact that irregular seizure raises solely the question of defendant's personal right to be free of the jurisdiction of an otherwise competent court. These other cases are not relied on by petitioner, however, as they are all completely contra to his present position, and he cited them only in an attempt to distinguish them. The futility of his attempt and the inapplicability of even those cases he has relied on will be discussed *infra.*

6. I shall spell out the details of the Cook case, infra.

7. See the five cases cited in footnote 5, supra, and Cook v. United States, supra.

8. United States v. Insull, D.C.N.D.Ill. 1934, 8 F.Supp. 310, 313.

## B. The Trial Court Had Jurisdiction

Although the fact that this motion is but another attack on the court's personal jurisdiction is sufficient reason in itself to deny the first petition, I find that the jurisdictional argument presented is totally lacking in merit, and I shall briefly consider it here, regardless of the principles of waiver and res judicata, lest petitioner urge that he is being deprived of his freedom on a mere technicality. Although this Court cannot consider these basic rules of waiver and res judicata to be "a mere technicality", nevertheless in the case of this petitioner I prefer that my decision not be based solely upon these fundamental legal principles but that it also rest upon a consideration of the merits.

Petitioner's contention with regard to this jurisdictional question is that his seizure violated a treaty, and the courts are bound to uphold the treaty which is the law of the land by finding the United States government to be devoid of power to proceed against him. He argues that Cook v. United States, 1933, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 is controlling here. In that case, the United States had seized a British vessel on the high seas and had started forfeiture proceedings against it for violation of the prohibition laws. Because of the liquor smuggling problem during prohibition, the United States and Great Britain had entered into a treaty which permitted British ships to enter United States ports with personal liquor stores on board in return for permitting the United States to seize British smugglers while still on the high seas, if they were within one hour's sail of this country. The ship Mazel Tov had been seized beyond that distance; thus the seizure had

been in direct violation of the treaty provisions and the court held that it had no jurisdiction to condemn the vessel. The court at that time distinguished situations where American ships had been seized in foreign waters for violation of American law. Such seizures were in violation of international law, but the Court said this did not operate to deprive the courts of jurisdiction. The Richmond, 1815, 9 Cranch 102, 13 U.S. 102, 3 L.Ed. 670; The Merino, 1824, 9 Wheat. 391, 22 U.S. 391, 6 L.Ed. 118. Thus the distinction that petitioner relies upon is that where a specific treaty is violated, as opposed to general international law, the courts will find themselves powerless to act.

This distinction is vital to his argument, as he leans upon it entirely in his attempt to avoid the controlling principle of law which the courts of this country have followed for seventy years. The rule is that a seizure of a fugitive on foreign soil in violation of international law will not deprive the courts of the offending state of jurisdiction over the person of the fugitive when he is brought before them. The question of violation of international law, they have continuously reiterated, is to be left to the proper consideration of the political and executive branches of the government should the offended state choose to raise the issue.[9]

In Re Johnson, 1897, 167 U.S. 120, 126, 17 S.Ct. 735, 737, 42 L.Ed. 103, the Court used the following language to explain its rationale:

> "The law will not permit a person to be kidnapped or decoyed within the jurisdiction for the purpose of being compelled to answer to a

9. Ker v. Illinois, 1886, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421; United States v. Dixon, D.C.E.D.N.Y.1947, 73 F.Supp. 683; United States v. Insull, D.C.N.D. Ill.1934, 8 F.Supp. 310; Ex parte Lopez, D.C.S.D.Tex.1934, 6 F.Supp. 342; United States v. Unverzagt, D.C.W.D. Wash.1924, 299 F. 1015, affirmed 9 Cir., 5 F.2d 492, certiorari denied 1925, 269 U.S. 566, 46 S.Ct. 24, 70 L.Ed. 415.

This listing does not include the numerous decisions reaching similar conclusions regarding interstate abductions, e. g., Pettibone v. Nichols, 1906, 203 U.S. 192, 27 S.Ct. 111, 51 L.Ed. 148; Mahon v. Justice, 1887, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283.

See also 1 Moore on Extradition, Chap. VII., Irregular Recovery of Fugitive.

mere private claim, but in criminal cases the interests of the public override that which is, after all, a mere privilege from arrest."

This principle has been followed again and again, in case after case involving charges of illegal abduction of a criminal defendant from another state or country—cases which petitioner has tried to distinguish on erroneous grounds completely contrary to the language of the courts themselves. See cases cited footnote 9, supra. This principle was most recently re-affirmed in Frisbie v. Collins, 1952, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541. That case—decided after McNabb v. United States, 1942, 318 U.S. 332, 63 S. Ct. 608, 87 L.Ed. 819, had extended the courts' role as supervisors of the administration of justice—indicated clearly that not only are there no jurisdictional issues raised by such abductions but there are no due process problems involved either. Speaking for a unanimous court, Mr. Justice Black stated [342 U.S. 519, 72 S.Ct. 511]:

"This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."

■ One exception to this general rule follows where the United States has invoked an extradition treaty in order to compel a foreign state to surrender a fugitive. In such circumstances, if the United States then tries the fugitive for a crime other than the one for which extradition was granted, it will be held to have violated the contractual obligations of the treaty and the courts will find themselves to be without jurisdiction over the defendant, unless he waives this issue. This rule was enunciated in United States v. Rauscher, supra; and followed in United States ex rel. Donnelly v. Mulligan, supra; Cosgrove v. Winney, supra, and Johnson v. Browne, supra. The compatibility of the Rauscher and Ker doctrines is illustrated by the fact that both were decided on the same day with the same Justice writing for the Court. Ker clearly distinguished the Rauscher situation as one in which the fugitive is clothed in the rights of the treaty.

It is patently obvious that Sobell is clothed in no such treaty rights. He urges that the fact that there was an extradition treaty in force in itself protected him from seizure or surrender save with reference to it and that his seizure was thus violative of its provisions. This same argument was made by Ker who was kidnapped from Peru by a United States emissary despite the existence of an extradition treaty, and his contentions were rejected. The Court pointed out that the sole obligation the surrendering state undertakes in an extradition treaty is that it will bind itself to extradite fugitives sought for certain enumerated offenses, where formerly it could have used its own discretion. And the sole obligation of the demanding state is that if it invokes formal extradition proceedings, it will try the surrendered fugitive only for the specific crime charged. Informal expulsion procedures are still available to the surrendering state both for enumerated and certainly for nonenumerated crimes, see IV. Hackworth, Digest of International Law, Chapter XII, and if the demanding state recovers its fugitives through illegal channels in violation of another nation's sovereignty, that cre-

ates a question for the political branches of the government, but does not raise any concerning judicial jurisdiction. See Moore, op. cit.

Thus the petitioner is certainly not within the rule of the Rauscher case, nor is his situation even remotely similar to that of the British ship seized in Cook.[10] Further, his own allegations indicate that the Mexican Police were the chief actors in his abduction, although he charges that they were acting illegally. This means his argument is blocked also by the rule that even a diplomatic demand for the return of an illegally seized fugitive need not be honored where officials of the asylum state took part in the illegal seizure. Note, Kidnaping of Fugitives from Justice on Foreign Territory, by Lawrence Preuss, 29 American Journal of International Law 502, 507 (July 1935). It is noteworthy that the petitioner has not even suggested that such a demand was ever made by Mexico.

It is clear that Sobell's argument that this Court lacked jurisdiction to try him because of his alleged illegal abduction would have been rejected as completely fallacious even had it been timely raised, and this is undoubtedly the reason his adroit lawyers refrained from making this motion among their numerous other applications for pre-trial relief.

Since the trial courts undoubtedly had jurisdiction over the subject matter, we shall now proceed to examine the second motion in order to determine whether the prosecution's actions were of such a nature as to deprive the petitioner of his constitutional rights, and vitiate the proceedings.

## II. Sobell's Contention That He Was Denied Due Process Of Law

Sobell's contentions here are that the prosecution suppressed evidence, knowingly introduced perjured testimony and false evidence, and made misrepresentations to the court.[11] Since his contentions are based in part upon occurrences at the trial, I shall set forth the relevant background briefly.

The direct evidence against Morton Sobell fell into two categories. First, Max Elitcher, a close friend, testified that Sobell had taken an active part in the conspiracy and had attempted to get him to reveal secret information concerning the national defense. This testimony was totally damning and convincing to the jury, and he was subjected to an intensive and exhaustive cross-examination by the attorneys for both defendants.[12] The court charged the jury specifically that they were to acquit Sobell if they did not believe Elitcher. The jury convicted. In short, the defendant was clearly proven to be an arch conspirator with the Rosenbergs in their plan to commit espionage against the United States by trafficking in our deepest military secrets—a crime of the highest magnitude.

The second category of evidence against Sobell related to his intent to flee the country. It had been brought out previously by David Greenglass that Julius Rosenberg, the head of the espionage ring, had urged him and his family to flee if the FBI started to close in, and had given Greenglass $4,000 to flee to Mexico and thence to Europe via Tampico. (R.522–537). Subsequently, it was established that Sobell had gone to Mexico with his family in the spring of 1950.

---

10. The sole remaining case cited by Sobell as supporting his position is United States v. Ferris, D.C.N.D.Cal.1927, 19 F.2d 925, and that case is on all fours with Cook.

11. The law is clear that if the prosecution knowingly either introduces perjured evidence against a defendant, or suppresses evidence favorable to him or makes misrepresentations to the court during the trial, that defendant is entitled to relief pursuant to Section 2255.

The cases cited by petitioner all merely illustrate these well known maxims by which I must be guided. I do not set them forth at length here because there is no controversy as to the guiding rules of law, there is merely a question as to whether petitioner's allegations make out a case under them.

12. Elitcher's cross-examination lasted two days and occupied 121 pages in the printed record. (R. 264–379, R. 388–394.)

He had gone openly and under his own name;[13] however, it was shown without contradiction that while in Mexico Sobell had traveled to both Tampico and Vera Cruz using aliases; that he had inquired as to how he might leave Mexico for Europe without proper papers; that while in Tampico and Vera Cruz he had enclosed letters to his wife in Mexico City in unmarked envelopes sent to a neighbor; and that while in Mexico he had sent letters to his family in America, not directly, but enclosed in envelopes which listed false names as return addressees, and he had sent these envelopes to a friend requesting that he forward the letters. These facts were brought out by six disinterested witnesses, and the defense made no attempt to cross-examine them and even conceded the use of several of these different aliases.

William Danziger, an old friend of Sobell's, testified that he had received letters from an M. Sowell and M. Levitov as the return addressees residing in Mexico; that he had opened them and found a note from Sobell requesting that he forward the enclosed letters to other members of the Sobell family. Sobell also requested Danziger to tell another relative that Sobell could be reached under the name of M. Sowell at a specified street address in Mexico. Danziger was not cross-examined. (R.857–867.)

Thereafter, the government called to the stand Manuel Giner De Los Rios, a neighbor of the Sobells in Mexico City. De Los Rios testified that Sobell had approached him for information as to how a person could leave Mexico without papers, saying that he was afraid to return to the United States because he did not want to go back into the Army, having already experienced one war. (R. 922.) It was subsequently shown that Sobell had never been in the Army, having been continually deferred. (R.955.) De Los Rios also testified that Sobell

had left his family and traveled to both Tampico and Vera Cruz. He knew this because during Sobell's absence, he had received two unmarked envelopes bearing postmarks from those two cities; inside each he found a letter beginning "Dear Helen" (the name of Sobell's wife), and he had turned both letters over to Mrs. Sobell. Again there was no cross-examination. (R.924–926.)

Subsequently, Minerva Bravo Espinosa, a clerk in a Vera Cruz optical store, testified that Sobell had ordered a pair of glasses from her using the name M. Sand, and defense counsel conceded this fact. (R.927–930.) Similarly, Jose Broccado Vendrell testified that Sobell had registered at his hotel in Vera Cruz as Morris Sand; again this fact was conceded and there was no cross-examination. (R.931–932.) Dora Bautista, a hotel clerk in Tampico, testified that Sobell had registered in her hotel as Marvin Salt, and this too was conceded. (R.933–934.) Glenn Dennis, an official of the Mexican Airlines, was called to testify, and via his testimony and defense concessions it was established that Sobell had flown from Vera Cruz to Tampico under the name of N. Sand, and from Tampico to Mexico City under the name of Morton Solt. (R.935–938.)

Not once during the trial did the defense attempt to explain the strange actions of this man and thus eradicate the impression of flight and guilty consciousness thus created. In summation defense counsel merely referred to these actions as "a brainstorm" which he said was none of anyone's business. (R.1503–1504.)

Immediately after these "flight" witnesses were called, the government attempted to introduce an immigration manifest card noting Sobell's return to the United States; the card was marked "deported from Mexico". The government attempted to introduce it as a rec-

---

13. It is noteworthy that the prosecution made no mention of Sobell's manner of departing from this country, and that his own attorneys did not see fit to introduce the airline manifests which showed that the family had traveled under its own name, although the defense did argue this point in summation. (R. 1502–1504.)

ord made in the ordinary course of business by the Immigration Service, but upon objection, the card was not allowed into evidence until the following day when James S. Huggins, the Immigration Inspector who had filled out the card, was flown to New York from Texas to authenticate it. He testified that the card was made out in the regular course of his duties, that he had obtained the information on it from Sobell himself when Sobell was brought to the border, except for the information regarding Sobell's "deportation". He explained that he had made the notation based on his *personal observation* that Sobell had been brought across the border by Mexican police. Despite repeated insistent questioning by defense counsel, he never suggested that he had made the entry because of any official information given him by the Mexican authorities or agents. He reiterated that the entry was based solely upon his observations at the time, and that he obtained Sobell's signature by telling him that all deportees must sign such cards. (R. 1025–1037.)

It is largely upon Huggins' testimony that petitioner bases his claims regarding suppression of evidence and perjury.

A. There Was No Perjury

It is the petitioner's contention that Huggins perjured himself when he testified that Sobell had been deported as he then well knew that Sobell's seizure had been contrary to Mexican deportation procedure; and the prosecution was allegedly in possession of this information also. Petitioner urges that this was harmful as it erroneously gave the jury the impression that Sobell's expulsion had been ordered after Mexico had made a prior determination of his guilt via a legal deportation proceeding.

This contention is clearly refuted by the cold record which shows that time after time Huggins insisted that his notation was not based on official sources, but was based solely upon his own observations of Sobell's summary ejection. It is entirely clear that he was using the word "deported" to mean expelled or ejected, and clearly even Sobell must have understood the notation to have that meaning as he himself signed the card when told that all deportees must do so.

It should also be noted that in summation, Mr. Kuntz, Sobell's attorney, pointed out that Sobell had not been legally deported from Mexico; he argued that if Sobell had been deported the government would have shown it by other more competent evidence. (R.1505–1506.) When Mr. Saypol, the prosecutor, summed up, he nowhere stated—or even inferred—that Sobell had been legally deported, but stated instead that "the FBI caught up with him and brought him back and you have him here." (R.1534.) Patently, this does not show an attempt by the prosecution to create the impression of legal deportation as is now charged. Manifestly, it was the prosecution's intention to use Huggins' testimony to point up that Sobell's return to this country had been involuntary. Thus it was the natural capstone to the clear and convincing testimony regarding Sobell's attempt to flee. Obviously, the defense attorneys also believed this was the sole purpose of introducing that evidence. They did not even attempt to bring the question of improper deportation procedures to the attention of the Judge out of presence of the jury—a device they had frequently employed throughout the trial—despite the fact that 24 hours elapsed between the time defense counsel saw the immigration manifest and the time that it was finally introduced into evidence via Huggins' testimony.[14]

14. Upon oral argument of the present motion, the petitioner's counsel made an issue of the fact that the prosecutors have not submitted affidavits with regard to their purpose in introducing Huggins' evidence. This type of argument completely disregards the cold, stark reality, that it is not what the prosecution intended that matters but what Huggins actually said and did. And I am sure that had such affidavits been introduced to show that the prosecution sought only to establish involuntary return, not legal deportation, the peti-

Clearly Huggins' testimony was not perjurious, nor was the manifest false, as it could rise no higher than Huggins' explanation regarding the "deportation" notation. Thus petitioner's allegations of perjury are completely unfounded.

B. The Government Did Not Suppress Any Evidence

(1) It did not suppress evidence regarding Sobell's alleged abduction.

Sobell's first contention regarding suppression of evidence is that the government suppressed the fact that he had been illegally abducted, both before trial and during it. I shall first deal with the prosecution's conduct before trial.

 It is hornbook law that the prosecution cannot suppress evidence or facts if they are known to the defense, and if it is true that Sobell was abducted, this fact was clearly and admittedly within the possession of Sobell and his counsel before the trial. Indeed, his affidavit makes it clear that Sobell knew that this alleged illegal seizure was highly irregular. The petitioner now alleges that the defense was not in possession of sufficient facts showing that the FBI had instigated this procedure as is charged now—but this is hard to believe in light of Sobell's assertions in his first affidavit, submitted in support of his motion in arrest of judgment,—that an FBI agent was waiting for him on the Mexican side.

 Further, there is no duty upon a prosecutor to present to the court a question which an intelligent and well-represented defendant sees fit not to raise on his own behalf, and which if raised, would be based necessarily on an argument that the Supreme Court should reverse a 70 year old rule of law.[15]

Dealing next with the contention that the prosecution should have brought out the facts regarding the alleged kidnapping during the trial—I cannot see in what way this would have been beneficial to Sobell, nor quite obviously, could Sobell's trial attorneys for they saw fit not to raise the issue before or during the trial. Even if this story might have created some sympathy for the defendant, it was incumbent upon the defense to raise this issue, if indeed the embellishments were not a figment of Sobell's imagination.

Since the defense had not seen fit to object to Sobell's alleged abduction, there was no ground upon which evidence regarding his involuntary return could be kept out, and as I previously pointed out, Huggins did not perjure himself. He merely stated that Sobell had been brought to the border by Mexican Secret Police and he stated further that the FBI was waiting for him.

The petitioner now contends that to rebut Huggins' testimony of seemingly routine expulsion, the defense would have had to put Sobell on the stand and that forcing this choice was unconstitutional. There are three grounds for rejecting this argument, each sufficient in itself.

 First, factually, this is not so. There were other available means of telling Sobell's story: (a) Sobell's own affidavit attests that Mrs. Sobell was a witness to the abduction; she was in court, but Sobell saw fit never to ask her to testify. (b) The record indicates that the defense had subpoenaed certain Mexican official documents—but decided not to introduce them. Indeed, a representative of the Mexican government was in court and was excused by the defense. (c) The defense did not even cross-examine Huggins on this point in an attempt to elicit from him that Sobell was in an obviously dazed condition, garbed in blood spattered clothes and that he complained to Huggins of his mistreatment, as petitioner now avers. As the Court of Appeals for the District of Co-

tioner's attorneys would have insisted just as vehemently that the prosecutors' state of mind was completely immaterial.

15. That this jurisdictional issue could be

waived and that the law would have been contrary to the petitioner's assertions, assuming he had decided to raise this issue, was spelled out in my discussion of his first motion infra.

lumbia Circuit stated in Smith v. United States:

> "The right to impeach * * * witnesses and to bring out on cross-examination the facts as to the alleged misconduct of the police are safeguards of appellant's right under the Due Process Clause to a fair trial." 1950, 88 U.S.App.D.C. 80, 187 F.2d 192, 199, certiorari denied 1951, 341 U.S. 927, 71 S.Ct. 792, 95 L.Ed. 1358.

 Second, the fact that Sobell might have had to take the stand to present his story does not mean he was denied his rights.

> "The Constitution safeguards the right of a defendant to remain silent; it does not assure him that he may remain silent and still enjoy the advantages that might have resulted from testifying." Stein v. New York, 1953, 346 U.S. 156, 177, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522.

 And it is obvious that Sobell had more to explain than just the testimony of Huggins; Huggins' notation that he was "deported" from Mexico would have been practically meaningless except in the context of the other witnesses regarding his flight, witnesses to whom I have referred and whose testimony Sobell does not challenge even now. It is interesting to note that Sobell's first attempt to explain his actions in Mexico came in an affidavit submitted on his original appeal to the Court of Appeals, a most unusual procedure, wherein he stated that the arrest of Julius Rosenberg made him think America was about to enter a state of totalitarian repression of free speech, that he decided to flee and used aliases trying to find out how to leave Mexico illegally and that he then changed his mind. This belated explanation was never put before the jury, as he and his attorneys undoubtedly decided it would be wiser not to do so. Sobell may not now be heard to urge that he is entitled to a new trial because the defense strategy on the first trial was not as soundly based as second guessing and fictional fantasies subsequently created indicate to him that it might have been.

> "[It is] of the essence of orderly trials that the right to counsel accorded to defendants by the constitution be not regarded, as the argument here would seem to regard it, as a mere one way street such that, if the strategy and tactics of his trial counsel, in determining not to raise constitutional questions, prove unsuccessful, defendant * * * may many years later set it aside in order that, on another trial with another counsel, another course raising these questions may be taken, and so on *ad infinitum*." Bowen v. United States, 5 Cir., 1951, 192 F.2d 515, 517, certiorari denied 1952, 343 U.S. 943, 72 S.Ct. 1036, 96 L.Ed. 1348.

 This principle set forth in Bowen is equally applicable to the third grounds for rejecting Sobell's argument. Even assuming that the introduction of the evidence regarding his testimony was improper—and I have pointed out that this is not the case—he is barred from raising that question now. Time after time the courts have held that whenever knowledge was in the possession of defense counsel during trial of facts which either established the impropriety of certain evidence, or even cast doubts upon its admissibility, they are barred from raising this question on a motion to vacate judgment. Questions on the admissibility of improper evidence may be raised solely upon appeal from the conviction.[16]

16. United States v. Lawrence, 7 Cir., 1954, 216 F.2d 570; Dauer v. United States, 10 Cir., 204 F.2d 141, certiorari denied 1953, 346 U.S. 889, 74 S.Ct. 141, 98 L. Ed. 393; Klein v. United States, 7 Cir., 1953, 204 F.2d 513; Smith v. United States, 1950, 88 U.S.App.D.C. 80, 187 F.2d 192, certiorari denied 1951, 341 U.S. 927, 71 S.Ct. 792, 95 L.Ed. 1358; Hilliard v. United States, 4 Cir., 1950, 185 F.2d 454; Howell v. United States, 4 Cir., 172 F.2d 213, certiorari denied 1949, 337

"Where parties, even in a criminal case, knowingly and deliberately adopt a course of procedure which at the time appears to be to their best interest, they cannot be permitted at a later time, after a decision has been rendered adverse to them, to obtain a retrial according to procedure which they have voluntarily discarded and waived." Carruthers v. Reed, 8 Cir., 102 F.2d 933, 938, certiorari denied 1939, 307 U.S. 643, 59 S.Ct. 1047, 83 L.Ed. 1523.

(2) No other evidence material to Sobell's case was suppressed.

■ The petitioner also contends that two documents which were seized from him at the time of his abduction were suppressed; they are his tourist card and a vaccination certificate. This contention is farcical on its face, as Sobell knew of the evidence. He also knew who had it and never sought its production, though he sought the production of numerous other documents. Further, the two items in question were not material to petitioner's case.

The first of these, his tourist card, could have established merely that Sobell went to Mexico under his own name; this was never denied or mentioned by the prosecution, and was specifically referred to by Mr. Kuntz in summation. Further, defendant's exhibits in this motion indicate that Sobell's attorneys had manifests of the airline on hand which clearly showed he traveled in his own name. They obviously decided, for trial strategy, not to introduce them.

As for the vaccination certificate, Sobell claims this shows he intended to return to the United States as it would be necessary for re-entry; he neglects to mention that this was an international certificate equally valid and equally necessary for entry into many foreign countries.

## C. The Prosecution Made No Misrepresentations To The Court

Both alleged misrepresentations which I shall hereafter set forth, were made to the Court by Mr. Saypol after the verdict had been rendered, upon argument of the motion in arrest of judgment. It is difficult to see how by the wildest stretch of the petitioner's vivid imagination these comments could have influenced the jury's verdict. Moreover, his comments had no effect on post-trial proceedings. Aside from my own personal recollections, it is clear from the record that Mr. Saypol's remarks were completely immaterial to the reasons behind the initial denial of the motion in arrest of judgment; the denial was based solely upon waiver, and Mr. Saypol's remarks did not deal with that question. Finally, even if Mr. Saypol's remarks could conceivably be considered as having had any influence upon the trial court—to say nothing of the Court of Appeals' later independent determination of this question—any possible harm done was negatived by the fact that petitioner has here been given an opportunity to relitigate in full the questions he raised on that first motion.

Since the remarks charged to Mr. Saypol were not false, however, and since I do not like to see men smeared by baseless accusations, I shall deal with them briefly.

First, when Sobell's initial petition was read to the Court on the motion in arrest of judgment, it contained language to the effect that, when arrested, Sobell had tried to show the agents his visa. Mr. Saypol pointed out "this very affidavit contains a falsehood in the statement that there was exhibited amongst other things to the Mexican authorities visas. Counsel ought to know that his client never went into Mexico with a visa." (R.1598.) That Sobell never had a visa is now conceded by his attorneys; he had a tourist card, and there is an appreciable difference between the two.

U.S. 906, 69 S.Ct. 1048, 93 L.Ed. 1718; United States v. Kranz, D.C.D.N.J.1949,

86 F.Supp. 776; United States v. Cameron, D.C.S.D.Miss.1949, 84 F.Supp. 289.

Second, Mr. Saypol is charged with having told the Court that Sobell was "kicked out" as a deportee, whereas in fact, Sobell was not legally deported. Mr. Saypol's statement has been lifted completely out of context; he made that comment when characterizing the contents of Sobell's own affidavit. He stated: "The whole affidavit portrays certainly that this defendant was not honorably escorted from Mexico but that literally he was kicked out as a deportee." That sentence speaks for itself.[17] (R. 1598–1599.)

### Conclusion

My consideration of the contentions urged in petitioner's second motion leads me to the conclusion that they are as utterly lacking in merit as are his contentions regarding the Court's lack of jurisdiction.[18]

This petition is so entirely devoid of merit that perhaps it has been unduly dignified by the minute consideration and analysis it has received in this opinion. However, an effort has been made to lay to rest with finality baseless contentions and accusations which have been repeated not primarily to aid the petitioner but rather to embarrass and injure our courts and country.

 The ancient writ of habeas corpus—to which Section 2255 is analogous—is one of the basic safeguards of America's freedom. Its purpose is to ensure that no man may be held in confinement in violation of due process of law, and it imposes a strict duty upon all officials connected with the government—state, local or national. But there is an equal duty imposed upon attorneys whose obligation it is to uphold the law, and the dignity and integrity of the courts. It is their duty as officers of the court to ensure that this great writ shall not be stripped of its deep meaning through a corrosive process caused by repeated abuses of its processes. Four lawyers argued these motions for Sobell, California counsel among them, and petitioner also had the services of an expert on Mexican law. The two legal memoranda submitted, which ran to over one hundred pages, and the numerous lengthy affidavits and exhibits indicate that an inordinate amount of time, money, effort and ingenuity was put into this motion on petitioner's behalf. If Sobell were an unlettered prisoner, friendless and without funds, attempting to cry out "unfair", his lengthy and utterly meritless petition might not be such a gross misuse of the judicial processes.

Under the governing rules of law, Sobell has been given the benefit of any doubt. For that reason all his allegations concerning the alleged brutality and illegality of his abduction were assumed to be true for the purposes of these applications. Therefore, I have not considered in this opinion the question of his veracity. But I find it difficult to believe that a man who was seized and blackjacked, as he claims, would not have immediately shouted out

---

17. It is also interesting to compare petitioner's present unfounded accusations against the prosecution with the statement by his defense counsel after the jury delivered its verdict. Mr. Kuntz stated: "I want to say to Mr. Saypol as an officer of this court, as one officer to another, I am willing to shake his hand after a job that we both had to do." (R. 1583.)

18. In short, I am led to the same conclusion that was reached by my colleague Judge Ryan after he had examined the contentions of all three defendants on their first motion pursuant to Section 2255.

"I have concluded * * * that the petitioners are entitled to no relief, that the court which rendered judgment had jurisdiction, that the sentences imposed were authorized by law and are not otherwise open to collateral attack on any of the grounds urged by the petitioners, and that full and complete enjoyment of the constitutional rights of petitioners has been extended them and has in no way been denied or infringed." United States v. Rosenberg, D.C.S.D.N.Y., 108 F.Supp. 798, 800, affirmed 2 Cir., 1952, 200 F.2d 666, certiorari denied 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384, rehearing denied 1953, 345 U.S. 1003, 73 S.Ct. 1151, 97 L.Ed. 1397.

this injustice to the world and would have held silent for six months prior to his trial and then throughout the trial, holding back his story as a sort of trump card. Experience dictates that human beings do not re-act that way.

The ease with which the petitioner tars all associated with the prosecution in the face of a clear record which proves the contrary is truly startling. As was recently said of another prisoner who engaged the courts endlessly with meritless petitions, " 'He is smart, shrewd, and resourceful.' Thus he knows how to make charges so wild . . . as to induce a concern for their refutation that otherwise he would not command." United States v. Tramaglino, 2 Cir., 1956, 234 F.2d 489.

From petitioner's unfounded attacks against the men who conducted the prosecution of his case, it is obvious that he believes in the broadside attack, painting with broad stroke and recklessly maligning all who participated in the process of bringing him to justice.[19]

During the course of my deliberations on this matter, as on other matters involved in this case from its inception, there have been many attempts to bring extrajudicial utterances and actions to my attention. Many of these have been designed to influence judicial determination in a way that is alien to our judicial process—and in some instances they constituted a subtle attack upon it. Freedom of speech should and does permit untrammeled discussion and differences of opinion, but judicial impartiality requires that the courts be free from extraneous and conflicting pressures. Therefore, the American judicial system has evolved its own safeguards and procedures for arriving at the truth—procedures which have withstood the test of the centuries. Those procedures and safeguards have been the sole guide posts for this Court.

The motions and the files and records of this case show conclusively that the prisoner is entitled to no relief. Motions denied.

---

19. In this connection, it is interesting to note that the petitioner brands the FBI as an agency of oppression, ignoring its reputation for high standards of fairness. These high standards were recently praised by the Court of Appeals for this Circuit in an opinion by Judge Frank, who is well known for his outspoken attacks on any form of police brutality. See United States ex rel. Caminito v. Murphy, 2 Cir., 1955, 222 F.2d 698, 703–704.