UNITED STATES v. PERL.
No. 149, Docket 22919.

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1954.

Decided Feb. 11, 1954.

Philip Wittenberg, New York City, for appellant, Irving Like, New York City, of counsel.

J. Edward Lumbard, U. S. Atty., New York City, for appellee, Lloyd F. Mc-Mahon and James B. Kilsheimer, III, New York City, of counsel.

Before FRANK, MEDINA, HINCKS, Circuit Judges.

MEDINA, Circuit Judge.

The indictment, which contains four counts, charges defendant with perjury in having testified falsely before a grand jury in the Southern District of New York, as follows:

(1) Q. Do you know Morton Sobell? A. Well, I do not, to the best of my recollection, although I realize he went through City College at the same time I did.

(2) Q. Do you know Helene Elitcher? A. No, I do not.

(3) Q. Do you know Julius Rosenberg? A. No, I do not, to the best of my recollection.

(4) Q. You are positive that you don't know either Ann Sidorovich or Michael Sidorovich? A. Well, so far as my recollection can carry me, I am positive.

The jury found defendant guilty on counts one and three which concerned Sobell and Rosenberg, but acquitted him on the counts relating to Helene Elitcher and the Sidoroviches. From the judg-

ment of conviction entered upon this verdict defendant appeals.

The indictment alleged that "it was material to said inquiry [before the Grand Jury] to ascertain whether or not the defendant knew or was associated with or had knowledge of the activities of Julius Rosenberg, Morton Sobell, Helene Elitcher, Ann Sidorovich and Michael Sidorovich, among others, in connection with an investigation of Soviet espionage."

■ The materiality of the questions was conceded by trial counsel for defendant, as well as the competency of the Grand Jury to conduct the inquiry, and the fact that the foreman of the Grand Jury administered the oath to defendant before he testified. But the sufficiency of the indictment to charge the crime of perjury is challenged on the ground that it fails to specify the law of the United States which authorized the oath to be administered, or the name or "qualification" of the person who administered the oath. Moreover, as the administration of such an oath is plainly provided for, 18 U.S.C.A. § 3771 and Rule of Criminal Procedure 6(c), 18 U.S.C.A., the statute authorizing the Supreme Court to promulgate this Rule is claimed to be unconstitutional, as in violation of the Sixth Amendment. It is not necessary to enter into any discussion of these technical points, as the case chiefly relied upon in defendant's brief, United States v. Debrow, 5 Cir. 1953, 203 F.2d 699, has since been reversed by the Supreme Court, 346 U.S. 374, 74 S.Ct. 113, 115, which based its rejection of similar unsubstantial contentions principally upon the ground that: "The Federal Rules of Criminal Procedure, 18 U.S.C.A., were designed to eliminate technicalities in criminal pleading and are to be construed to secure simplicity in procedure."

■■ It is to be implied from the argument made on defendant's behalf that the contention is made that there is some inconsistency in the verdict which requires a reversal of the judgment.

But there is nothing in this; the testimony relative to defendant's contact and association with Helene Elitcher and the Sidoroviches, while sufficient to comply with the two-witness rule applicable in perjury cases, was meager in bulk and circumstantial detail in comparison with that of the many witnesses who testified to the long series of occasions when defendant was with Sobell and Rosenberg and the substantial corroboration, to be found in some of the documents conceded to have been written by defendant and otherwise. There was ample basis for the conclusion of the jury that, while defendant's guilt with respect to his grand jury testimony relative to Sobell and Rosenberg was established to their satisfaction beyond a reasonable doubt, there was such a doubt as to his recollection of the others. And, even if there had been some inconsistency based upon a consideration of the evidence as a whole, this would not ordinarily justify a reversal. See Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356.

Nor is there any merit in the contentions that the evidence was not sufficient to support the verdict and that defendant was deprived of a fair trial because of the references to Communists and espionage.

By way of background to a review of the proofs it will be helpful to examine the substance of the defense on the merits and the charge of the trial judge. From the beginning of the trial until the end trial counsel for defendant took the position that the sole issue was whether the defendant, in view of his background and experience, "the kind of work he is doing" and his "mental state or condition" at the time, believed his answers to be true. Defendant was described by his trial counsel as a "sort of young Einstein who loves physics," and as in a distressed state of mind due to his interrogation by the FBI before he was subpoenaed to testify before the Grand Jury. Such also is the general purport of defendant's own testimony at the trial, which covered these subjects in

great detail; and he described the interpretation he placed upon the questions when propounded to him before the Grand Jury. As trial counsel for defendant expressed it in his summation, defendant's mind is claimed to have worked in this fashion: "I want to do everything I can to help the Government. I want to disassociate myself from these people, Rosenberg and Sobell, Barr and Sarant, and the rest of the crew, just as far as I truthfully can—as far as I truthfully can. I don't want to go to the extent of committing perjury or lying about it, because that certainly would interfere with physics." Counsel for defendant further stated: "My instructions were to concede everything. He wanted **to** get everything before the jury."

Thus it was defendant's counsel who requested that the entire testimony given by defendant before the Grand Jury be received in evidence; it was he who requested the trial judge to explain to the jurors who Julius Rosenberg was; and it was he who brought out defendant's testimony that he was not and never has been a Communist, whilst pursuing the subject of Communism at considerable length in his cross-examination of one of the Government's witnesses relative to the affiliation of the witness with the Communist Party and an attempt by Rosenberg to get information from him for the Soviet Union.

The charge of the trial court was described by trial counsel for defendant as "entirely fair," except that he preserved his point, which has already been discussed, that "The oath was not administered pursuant to law." And the charge was in accordance with what counsel for defendant had been contending from the outset was "The sole issue." It was as follows:

"* * * The issue or question with reference to each count is as to the defendant's belief at the time he testified. In analysis, the issue to be determined by you is not whether Perl did in fact meet or have contact with the individual or individuals named in a particular question, but whether he had met or had personal contact with that individual or individuals so frequently or so often, or at such times and on such occasions, that he did in fact know the individual and remembered and identified the individual by name, when he uttered his denials and so testified contrary to his knowledge and belief.

"Also ask yourselves: How did the defendant interpret and understand the questions put to him? When he was asked, 'Do you know Morton Sobell?' or 'Do you know Helene Elitcher?' or 'Do you know Julius Rosenberg?' did he understand those questions in their common and accepted meaning, or did he understand the word 'know' to mean 'intimately acquainted with,' or 'having close association with'; and did he then reply in accordance with and not contrary to his belief and understanding of the questions asked of him.

"If the questions put to the defendant were honestly taken and understood by him to have a different meaning from that which the interrogator intended, or as they are commonly understood, and you find that the defendant Perl answered the questions truthfully as he interpreted them and as he understood them and did not intend, according to his belief, to falsify, you must acquit him."

That the evidence far exceeded the minimum required to support a perjury charge seems clear beyond shadow of doubt.

Sobell and Rosenberg were classmates of defendant at C. C. N. Y., where defendant received the degrees of Bachelor of Engineering in 1938 and Master of Electrical Engineering in 1940. Sobell and Rosenberg also took the course in Electrical Engineering. The Assistant Registrar of the college produced records which showed that defendant and Sobell were in the same class and section for eight courses with sections having

as few as seven students, meeting as often as three times a week. He was also in the same class and section as Rosenberg for two courses, one of which had only fourteen students and met three times a week, the other with twenty students meeting twice a week. There was also testimony by several collegemates of defendant who were on intimate terms with him, and who saw defendant with Sobell and Rosenberg in the lunchroom and in the "Tech" Building at C. C. N. Y. "a half dozen to a dozen times a month," and present with them at meetings of the Young Communist League as well as at rallies in Union Square. One of these witnesses described a conversation had with defendant who described himself as active in the Young Communist League and pointed out as examples of others Max Elitcher, Morton Sobell and Julius Rosenberg. Another witness described in some detail the Steinmetz Club, affiliated with the Young Communist League of C. C. N. Y., which consisted of a group of engineering students. This witness attended ten to twelve of the meetings of the Steinmetz Club during the period of 1937 and 1938 and said there was "a constant nucleus of about ten to fifteen people," including defendant, Rosenberg and Sobell, and Rosenberg introduced the speakers and led the discussion.

There was testimony by two witnesses, with a wealth of circumstantial detail, describing two separate gatherings or meetings, one in the summer of 1944 and the other around Christmas of 1946. Max Elitcher, also one of defendant's C. C. N. Y. classmates, and Rosenberg, together with Elitcher's wife and sister-in-law, were waiting on the corner of 8th Avenue and 42nd Street in New York City, in 1944, when the defendant and his brother met them, evidently by prearrangement with Rosenberg. The incident is described by the two Elitchers. The group dined at a nearby restaurant, where another classmate Joel Barr joined them, after Rosenberg had telephoned to him. They all pro-

ceeded to Barr's apartment, where they remained until midnight. After taking Elitcher's sister-in-law home they then proceeded to a walk-up apartment on Morton Street in Greenwich Village where, after climbing five flights of stairs, they woke up Al Sarant, and there was more talk for another half hour. Rosenberg and defendant were with the group from the time defendant met them on the street until the party broke up and they left Sarant's apartment.

The two Elitchers also testified concerning the meeting in 1946. On this occasion the Elitchers met Rosenberg outside of the apartment house where Sarant lived on Morton Street and they walked to a restaurant about a block away, where they met defendant and Barr, who were waiting for them. They were soon joined by Sobell and his wife. After dinner they proceeded to Rosenberg's apartment in Knickerbocker Village where they joined Rosenberg's wife. On this occasion defendant was with both Rosenberg and Sobell during the entire evening, the party breaking up about midnight.

While there was more than ample proof of defendant's association with Rosenberg, the proof of his relationship with Sobell was overwhelming, and included documentary evidence of conceded authenticity in defendant's handwriting. If the witnesses are to be credited, and their testimony was corroborated not only by the documents but to some extent by testimony of defendant, given at a later date to the same Grand Jury, defendant and Sobell were for many years on terms of intimacy and friendship.

█ On this evidence the trial judge had no alternative other than to send the case to the jury with appropriate instructions; and that is what he did. It was the function of the jury to decide all questions of credibility.

█ Nor does the claim that defendant was deprived of a fair trial rest on any more substantial foundation. There

was no way in which the case could be tried without reference to Communists or Communism and to espionage. The prosecution was conducted with restraint and the trial judge was at all times alert to eliminate extraneous matter and keep the central issue unclouded. His fairness was the subject of comment by trial counsel for defendant on several occasions and these comments were entirely justified.

Moreover, it was counsel for defendant who pressed upon the court and jury many of the references to Communism and espionage, as they bore directly upon the defense concerning defendant's state of mind when he testified before the Grand Jury. As above stated, it was defense counsel who specifically requested that the entire testimony of defendant before the Grand Jury be placed in evidence. Thus there came into the case the fact that, shortly prior to his interrogation before the Grand Jury, defendant had been repeatedly interviewed by the FBI concerning his relationship with Rosenberg and Sobell, and that in the latter part of July, 1950 (the first interrogation before the Grand Jury being August 18, 1950), he was visited at his apartment in Cleveland by Vivian Glassman, whom he recognized as a friend of Joel Barr's and "was aware of the fact that she was engaged in radical activities of some kind." Defendant told the Grand Jury that she took a piece of paper and wrote down some instructions she had memorized to the effect that she had money for him so that he could go to Mexico, with some mention of Rosenberg. He said he thought it was a trap and that "possibly a Communist apparatus of some kind" was behind it. Significantly, however, he destroyed the paper and said nothing about the incident to the FBI for several days, after he had consulted a lawyer.

In his testimony at the trial he described his distress of mind caused by the FBI interrogation and said "the FBI's strong emphasis to me that Rosen-

berg and Sobell faced the death penalty horrified and shocked me."

But the fact that he had been interviewed by the FBI about Rosenberg and Sobell, and had been visited by Vivian Glassman who also made some reference to Rosenberg, just previous to his appearance before the Grand Jury, bore not only on his defense with respect to his state of mind, but also on the probability that these unforgettable incidents had refreshed his recollection on the subject of his past relations with Rosenberg and Sobell.

The testimony given by defendant at the trial may well have removed any lingering doubts in the minds of the jurors. They may have inferred that he knowingly withheld the Morton Street apartment in his statement of previous addresses to the United States Atomic Energy Commission, in filling out his Personal Security Questionnaire. This, and many other evasions and equivocations, might well have seriously affected his credibility. Certain it was that he subleased this same apartment from Sarant, lived there for a substantial period of time, and gave it as his voting residence in 1947 and 1948. Moreover, no less than nine money orders were sent to Sarant in payment of rent, and on each defendant gave his address at 65 Morton Street, Apartment 6–I, New York 14, N. Y.

A few miscellaneous alleged questions of law merit no extended discussion. The indictment did not charge defendant with participation in any espionage and the claim that it was incumbent on the prosecution to prove that he was associated with or had knowledge of the espionage activities of Rosenberg and Sobell is little short of frivolous. The same may be said of the contention that there must be some proof bridging the gap between 1946, the time of the Christmas meeting with Rosenberg, Sobell and the rest, and August, 1950, when defendant's testimony before the Grand Jury commenced. If defendant thought prejudice might result from the

trial of the four counts of the indictment together, he should have moved for a severance. But he did not.

It is a deplorable fact that this young man of such promise and ability should have become so enmeshed in the toils as wilfully to testify falsely before a Grand Jury of the United States embarked upon an investigation of Soviet espionage; but on this record, free from any taint of error, he has justly been found guilty of that offense.

Affirmed.