**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Morton SOBELL, Defendant-Appellant.**

**Nos. 235, 236, Dockets 24299, 24300.**

United States Court of Appeals Second Circuit.

Argued March 5, 1957.

Decided May 14, 1957.

Paul W. Williams, U. S. Atty., for the Southern District of New York, New York City (Robert Kirtland and Maurice N. Nessen, Asst. U. S. Attys., New York City, of counsel), for plaintiff-appellee.

Donner, Kinoy & Perlin, New York City, and Benjamin Dreyfus, San Francisco, Cal. (Frank J. Donner, Arthur

Kinoy and Marshall Perlin, New York City, Benjamin Dreyfus, San Francisco, Cal., and Luis Sanchez Ponton, Mexico City, Mexico, of counsel), for defendant-appellant.

Before MEDINA and WATERMAN, Circuit Judges, and GALSTON, District Judge.

MEDINA, Circuit Judge.

At the close of a trial with his co-defendants Julius and Ethel Rosenberg, appellant was sentenced to thirty years imprisonment on April 5, 1951. After numerous attempts to vacate the judgment of conviction on various grounds, including several prior applications under 28 U.S.C. § 2255, all of which were denied and the rulings affirmed on appeal, United States v. Rosenberg, 2 Cir., 195 F.2d 583, and certiorari denied by the Supreme Court, 344 U.S. 838, 73 S.Ct. 21, 97 L.Ed. 652, appellant made the two motions which resulted in the order appealed from. The first motion is based upon the charge that, at the trial in 1951, the prosecution "knowingly, willfully and intentionally used false and perjurious testimony and evidence, made false representations to the Court, and suppressed evidence which would have impeached and refuted testimony given against petitioner." The second motion is based upon the charge that the "United States itself, as well as its courts * * * lacked all sovereignty and power to conduct the proceedings," and that the trial court lacked jurisdiction because of alleged violations of the Constitution and laws of the United States, including "the Extradition Treaty between the United States and Mexico." The subject matter of these charges relates to the seizure of appellant in Mexico City by the Mexican Security Police, his transportation to Laredo, Texas, where the United States Immigration Inspector made a record of appellant's entry on August 18, 1950 into the United States, and his arrest, pursuant to a warrant duly issued on August 3, 1950 in the Southern District of New York. While appellant asserts that his contentions have not been made before, the records of the District Court make it abundantly plain that, except for some elaboration in matters of detail and the articulation of what are alleged to be new legal theories, the charges are not new, but have already been rejected in one form or another. These prior proceedings and the procedural obstacles to any possible favorable action on the two new motions have been so fully set forth in the detailed discussion appearing in the well reasoned and comprehensive opinion of Judge Irving R. Kaufman, D.C., 142 F.Supp. 515, that we think it not necessary to do more than note our approval of what he has written.

The charges are of such a serious and sensational character, however, and upon careful examination they turn out on the face of the record to be so utterly groundless, that we shall briefly set forth our reasons for holding that the trial judge could not have arrived at any conclusion other than to decide, as he did, that there be no hearing on either application, as "the files and records of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255. There was no foisting of perjurious testimony upon the court and jury by the prosecution; no false representations were made; there was no suppression of evidence; there was no violation of the Extradition Treaty between the United States and Mexico, or of any of the provisions of the Constitution and laws of the United States; and the motions were properly denied in toto.

**I**

At the trial there was evidence which definitely connected appellant with the aims and purposes and with the consummation of the ends of the espionage conspiracy. United States v. Rosenberg, 2 Cir., 195 F.2d 583, certiorari denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, rehearing denied, Sobell v. U. S., 344 U.S. 889, 73 S.Ct. 180, 97 L.Ed. 687. This was supplemented by proof from which the jury might well have inferred that the Rosenbergs and appellant sus-

pected that the FBI was closing in on them and that an elaborate plan was devised which envisaged escape from the law enforcement authorities of the United States by flight to Mexico and thence by way of Vera Cruz or some other seaport to Europe, with Soviet Russia as the ultimate destination. We had another phase of this same planned exodus to Mexico before us in United States v. Perl, 2 Cir., 210 F.2d 457, in which case Perl testified in his own defense and described how he was approached on the subject.

The testimony in this case was to the effect that Rosenberg outlined a pattern of flight for David Greenglass and his wife that would take them to Mexico, then to Europe via Vera Cruz and finally to Russia. Shortly after Greenglass and Harry Gold, another member of the spy ring, were apprehended, appellant began to follow the pattern of flight outlined by Rosenberg to the Greenglasses.

Accordingly, the prosecution proved at the trial that appellant with his wife and children went to Mexico City in the spring of 1950. Had this been a vacation jaunt for a brief sojourn, with the intention of returning to the United States, there was ample opportunity for appellant's experienced and astute trial counsel to adduce evidence to prove it; but no such evidence, testimonial or documentary, was forthcoming, and appellant did not even testify in his own defense. The prosecution, on the other hand, produced a number of witnesses who made it clear that appellant went to Mexico for purposes of flight, with a quite settled determination not to return to the United States if he could avoid doing so. The relevancy and sufficiency of this evidence have already been passed upon. United States v. Rosenberg, supra.

The witness Manuel Giner de los Rios, who lived in the same apartment house as appellant in Mexico City, testified that he became acquainted with appellant, who told him some time in July that he was an American and was afraid that "they were looking for him so that he

would have to go in the Army"; that appellant was looking for information as to how to get out of Mexico; that a few days later appellant asked for directions of how to go to Vera Cruz, which the witness gave him; that appellant was away for about 15 days, somewhere around the 20th or 22nd of July, 1950, during which period of time the witness received from appellant in the mail an envelope postmarked Vera Cruz addressed to the witness, containing a letter which the witness delivered to appellant's wife, and another postmarked Tampico, another Mexican seaport, also containing a letter for appellant's wife.

Other witnesses testified to the use by appellant of false names and an elaborate system of correspondence from appellant in Mexico, enclosing letters for delivery to members of appellant's family in the United States, with return addresses on the envelopes and the names "M. Sowell" and "M. Levitov." The effort to avoid interception and detection is perfectly plain. Indeed, in one of his prior Section 2255 applications appellant stated: "I left the family in the Mexico City apartment and travelled around Mexico to Vera Cruz and Tampico, even using false names and inquiring about passage to Europe and South America for all of us."

The proof of appellant's return to the United States by the Mexican Security Police merely supplemented the proof of appellant's consciousness of guilt by explaining his presence at the trial, which appellant appears to concede was not voluntary. As we said on the first appeal, United States v. Rosenberg, supra, 195 F.2d at page 602, "otherwise the jury might have inferred that he had returned voluntarily to stand trial."

So we turn to the specifications of alleged perjury, false representations and suppression of evidence.

Immigration Inspector Huggins testified that on August 18, 1950 about nine Mexican officials brought appellant to him in Laredo, Texas, that he filled out the manifest, which is now challenged as palpably false, noting from what he had

observed and not from anything said to him by the Mexican officials, "Deported From Mexico," and further data, such as appellant's occupation of electrical engineer, that he had spent all his life in the United States "until about two months ago," his age, address, and so on, from answers given to him by appellant. On the reverse side of the manifest, under "Remarks and Endorsements" is written, "Brought to Imm. Office by Mex. Police," followed by the signatures of Inspector Huggins and appellant.

By some process of reasoning that is far from clear to us, this is supposed to be wilful perjury because appellant asserts that he was assaulted and "kidnapped" by the Mexican Security Police, as agents of or instigated by the FBI, and brought to Laredo, Texas, without any formal deportation proceedings, which we are told are elaborate and technical and always observed with meticulous care by the Mexican authorities.

■■■ But appellant was nonetheless deported and the witness did no more than testify to what he personally observed, or was told by appellant, and noted in the manifest in the regular course of his official duties. It is nothing short of absurd to characterize this as wilful perjury deliberately foisted on the trial court by the prosecution. There was no perjury.

The charge that the judgment of conviction cannot stand because the prosecutor procured it by false reprsesentations also falls of its own weight. On appellant's motion in arrest of judgment, made shortly after the conclusion of the trial, and on April 5, 1951, his counsel referred to the manifest prepared by Inspector Huggins as a "downright falsehood," and read into the record an affidavit of appellant describing the "kidnapping" in some detail, in the course of which appellant stated that he tried to show the Mexican police his "papers, visas etc.," concluding with the charge that the United States had secured jurisdiction over appellant "by a criminal, illegal, act, and so the United States

must send Sobell back to the place where they took him from, to deal with him accordingly some time in the future." This motion was denied and the order affirmed and certiorari denied, and this forms part of the background described in the opinion of Judge Irving R. Kaufman, supra.

■■■ The alleged false statements were made by the prosecutor who spoke briefly, after counsel for appellant had fully stated the grounds for his motion in arrest of judgment. The first of these is:

> "This very affidavit (of Sobell) contains a falsehood in the statement that there was exhibited amongst other things to the Mexican authorities visas. Counsel ought to know that his client never went into Mexico with a visa."

This is supposed to be false because, although appellant concededly had no visa, he did have a tourist card, which counsel now insists is a "tourist card (visa)." Thus the charge collapses. The statement as made was in all respects true. The balance of the claim of wilful deception of the court has in effect already been disposed of. The prosecutor said:

> "The whole affidavit (of Sobell) portrays certainly that this defendant was not honorably escorted from Mexico but that literally he was kicked out as a deportee."

As the trial judge had the affidavit before him, it is difficult to see how any characterization of its contents could possibly justify a charge of wilful misrepresentation and deception; but in fact the statement was accurate. Appellant was deported from Mexico; he did not return to the United States voluntarily; and the expression "kicked out," while perhaps offensive to a refined ear, describes precisely what happened to him on August 18, 1950.

The alleged suppression of evidence is more of the same thing, with some elaboration. Appellant's international vaccination certificate is mentioned but appellant knew of its existence, made no

reference to it at the trial, and he must have realized that it would cut both ways if offered in evidence. He might well have claimed that its possession demonstrated an intention to return to the United States, but the prosecution would just as likely have argued to the contrary. None of the remaining so-called "facts of abduction" tended in the slightest degree to demonstrate that appellant would have returned to the United States of his own volition. Nor are we able to discern any suppression of any evidence by the prosecution.

The nub of the matter is that what appellant now asserts he asserted in substance and in the most unequivocal way in his motion in arrest of judgment. It was then clear that what he then knew was available for his defense at the trial but, as stated by Judge Frank in his opinion on the first appeal, United States v. Rosenberg, 195 F.2d at page 603: "He preferred to take his chances on the verdict, withholding his trump card until the trial was over. The Federal Rules of Criminal Procedure [18 U.S.C.A.] allow no such tactic." We may add that the "trump card" would probably have proved more harmful than beneficial to appellant's defense. At least it is fair to assume that such was the conclusion arrived at by his trial counsel. They decided not to pursue the subject at the trial, further than upon the cross-examination of Inspector Huggins, who testified that he was expecting appellant at Laredo, Texas, and "we had a lookout on him to prevent his departure from the United States." When this testimony was thus elicited, counsel for appellant stated, "that is just exactly what I wanted to get at," but the subject was not pursued further after Inspector Huggins left the witness stand.

The cases relied upon by appellant, such as Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932; Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, and Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 and others, where the court found perjured testimony had been used or there was improper conduct on the part of prosecuting officers, involve facts which bear not even a remote resemblance to the factual background of this case; the principles stated in those cases have no application here.

## II

Appellant's supplementary motion also rests upon the charge that he was forcibly abducted from Mexico by the Mexican Security Police as agents of the United States. He contends that the alleged abduction was a violation of the Extradition Treaty between the United States and Mexico, 31 Stat. 1818, and that as a result the United States lacked power to proceed against him. He relies upon Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641, which holds that the United States courts may not acquire jurisdiction by means of a treaty violation. As appellant says, his "objection to national and, consequently, judicial power does not rest on the kidnapping or abduction of appellant as such, but rather upon the violation of the treaty." We must inquire, therefore, whether there has been a violation of the treaty with Mexico.

It seems too plain for reasonable debate that Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421, answers that question in the negative, even if appellant's factual assertions be taken as true. That case involved a treaty with Peru, 18 Stat. 719, in all pertinent respects the same as the one before us, i.e., each treaty provides for extradition for certain named crimes and neither the treaty with Peru nor the treaty with Mexico in terms prohibits abduction by one party of criminals found in the territory of the other. Ker, who had been charged with a crime committed in the United States, had left the country and was located in Peru. The President of the United States issued a warrant and sent a messenger to Peru to receive Ker from the Peruvian authorities in compliance with the treaty. Instead, the messenger kidnapped Ker and returned him forcibly

to the United States. Ker excepted to the jurisdiction of the court but was convicted. Upon Supreme Court review of affirmance of his conviction by the Illinois court, Ker urged two other grounds for reversal,

"But the main proposition insisted on by counsel for plaintiff in error in this court is, that, by virtue of the treaty of extradition with Peru, the defendant acquired by his residence in that country a right of asylum,—a right to be free from molestation for the crime committed in Illinois, a positive right in him that he should only be forcibly removed from Peru to the state of Illinois in accordance with the provisions of the treaty,—and that this right is one which he can assert in the courts of the United States in all cases, whether the removal took place under proceedings sanctioned by the treaty, or under proceedings which were in total disregard of that treaty, amounting to an unlawful and unauthorized kidnapping." 119 U.S. at page 441, 7 S.Ct. at page 228.

Although the language appellant uses is slightly different, there can be no doubt that he is asserting precisely the same claim as did Ker, which claim was rejected by the Supreme Court.

And the Ker case continues to have validity. It was cited in the Cook case, relied upon by appellant, and in Frisbie v. Collins, 342 U.S. 519, at page 522, 72 S.Ct. 509, at page 511, 96 L.Ed. 541, where the Court said:

"This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' "

■ Appellant seeks to avoid the impact of the Ker case by insisting that, although there was no treaty violation in that case, there was such a violation in the case at bar. "Unlike the facts in Ker," appellant says, "the petition here charges action by the United States Government * * *." Appellant relies on "The actions of the United States' agents in initiating, planning and participating in the seizure." But it can hardly be maintained, still assuming the truth of appellant's charges, that the unlawful and unauthorized acts of the Mexican police acting in behalf of subordinate agents of the executive branch of the United States Government were any more acts of the United States than the unlawful and unauthorized acts of the emissary of the Chief Executive. We think the question presented is indistinguishable from that before the Supreme Court in Ker, and that our decision here is controlled by that case.

Affirmed.