**Charles Laurent FIOCCONI and Jean Claude Kella, Petitioners,**

v.

**ATTORNEY GENERAL OF the UNITED STATES et al., Respondents.**

**No. 72 Civ. 446.**

United States District Court, S. D. New York.

March 16, 1972.

Grunewald & Turk & Gillen, Brooklyn, N. Y., for petitioners; Raymond B. Grunewald, of counsel.

Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, New York City, for respondents; Dean C. Rohrer, Arthur J. Viviani, Asst. U. S. Attys., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioners, Charles Laurent Fiocconi and Jean Claude Kella, citizens of France, were extradited from Italy to this country to stand trial upon an indictment returned in the District Court of Massachusetts, and subsequently were indicted in this district, where they are presently detained under that charge. They seek their release by writ of habeas corpus, alleging that the indictment in this district and the arrest warrants issued thereunder are illegal, void and in violation of their rights under the Constitution and laws of the United States, and the Law of Nations.

The essence of their claim, in reliance upon United States v. Rauscher [1] and United States v. Paroutian,[2] is that they "cannot be arrested and tried for any other offense allegedly committed in the United States prior to their extradition other than the specific and separate offense for which they were extradited"—in sum, they contend they can only be prosecuted for the crime charged in the Massachusetts indictment.

The Massachusetts indictment was filed on November 20, 1969, and charged petitioners and other defendants with conspiring from September 15, 1968,

1. 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886).

2. 299 F.2d 486 (2d Cir. 1962).

through April 22, 1969, to import heroin into the United States in violation of 21 U.S.C., section 174. That indictment set forth overt acts committed in New York City, Paris and Boston during April 1969, culminating in one conspirator flying from France to Boston with thirteen pounds of heroin taped to his body. Bench warrants were issued, but the petitioners were not apprehended in this country. They were traced by Interpol to a town in Italy, where in August 1970, they were arrested by Italian authorities. When arrested, they gave false names and were in possession of false passports, for which offense they were convicted in Italy and received five months' sentences. At a preliminary hearing, Fiocconi and Kella announced they intended to resist extradition to the United States, and protracted hearings ensued.

In September 1970, the United States Embassy in Rome formally requested their extradition, based upon the Massachusetts indictment. In its representation to the Italian government, the Embassy acknowledged that narcotics crimes were not specifically enumerated in the Extradition Convention of 1868 between the United States and Italy,[3] and its supplementary conventions. However, it observed that independent of the Treaty, the Italian government can grant extradition when the offenses for which it is requested are also crimes under the laws of Italy, provided the Treaty itself does not expressly restrict extradition for such crimes and there was no such restriction in the existing Convention. The United States Embassy then noted that the crimes with which petitioners were charged under the Massachusetts indictment were also crimes under Italian law; that the offenses charged against them "are serious, and the amount of narcotics in which they were trafficking is great"; and for those reasons and "in view of strong public opinion condemning drug traffic, it is hoped that the Italian government will, as an act of comity," grant the extradition request. To support its request, the United States submitted a copy of the Massachusetts indictment, the bench warrants, the grand jury testimony, photographs to identify the defendants, and an affidavit setting forth the applicable law under 21 U.S.C., section 174. On the basis of the evidence submitted by the United States government and its own evidentiary hearing, the Section for Preliminary Hearings of the Court of Appeals of Florence ruled in favor of the extradition of petitioners to the United States "so that they can be subjected to judgment according to the writ of indictment against them formulated by the Grand Jury of the District . . . of Massachusetts . . . ."

The order of extradition was upheld on appeal, whereupon petitioners were duly delivered to United States authorities and removed to Boston on October 6, 1971. On the following day, petitioners there entered pleas of not guilty to the indictment; bail was set in the amount of $250,000 for each, which was met by surety bonds secured by a $500,-000 certified check drawn on a Swiss bank. Soon after their release on bail, the petitioners were subpoenaed to appear before a grand jury in this district. When they responded thereto they were arrested upon warrants issued under an indictment returned that day by a grand jury in this district. They were charged as sole defendants with receiving, concealing, selling and facilitating the transportation, concealment and sale in the Southern District of New York of approximately thirty-seven kilograms of heroin in violation of 21 U.S.C., sections 173–74. The offense was alleged to have occurred on or about May 27, 1970. Bail was initially set at $250,000 for each defendant, which subsequently was reduced to $100,000 each. On failure to post the additional bail, Fiocconi and Kella were remanded to custody.

Petitioners thereupon sought their release by a writ of habeas corpus on the ground that the Southern District indictment charged an offense committed prior

3. 15 Stat. 629.

to extradition and other than that for which they had been specifically extradited. While that application was under advisement, the grand jury returned a superseding indictment on January 4, 1972.[4] Bail was again set at $100,000 and petitioners are still in custody. This current indictment charges petitioners and twenty-one other defendants with conspiring to violate narcotics laws [5] and with substantive offenses. The alleged conspiracy spanned the period from January 1, 1970, through January 4, 1972. The overt acts alleged in furtherance of the conspiracy included the concealment of heroin in automobiles from May 1970 through October 1971. The two substantive counts wherein petitioners are named charge substantially the same offense as contained in the first Southern District indictment; one count charges the unlawful importation of thirty-seven kilograms of heroin on May 27, 1970, and the other charges the receipt, concealment, sale and facilitation of the transportation, concealment and sale of the same amount of heroin two days later. Thus, the offenses charged in both the conspiracy and substantive counts of the current Southern District indictment are alleged to have occurred subsequent to the commission of the offenses charged in the Massachusetts indictment, but prior to petitioners' extradition from Italy,

although the conspiracy is alleged to have continued even after the extradition.

Accordingly, petitioners contend that their detention under the current indictment in this district is illegal and void, in violation of their rights under the Constitution and laws of the United States, the Law of Nations, and in violation of the warrant of extradition from the government of Italy and the obligations of the United States pursuant thereto, since the offenses charged are other than the offense for which they were extradited and were committed prior to the time of their extradition.[6] They charge that their indictment here was not only a violation of their rights, but an act of bad faith against the government of Italy.

The starting point for their position is United States v. Rauscher.[7] There, the defendant had been extradited from Great Britain to the United States pursuant to a treaty between the two governments to stand trial for the extraditable offense of murder on the high seas. The treaty had no express provision restricting the demanding country to try a person only for the crime for which he was extradited. Yet the Supreme Court held that the defendant could not be tried for the different and non-extraditable offense of "cruel and unusual" punishment even though based upon the iden-

4. On February 23, 1972, the government filed a nolle prosequi disposing of the prior indictment. The first petition for habeas corpus directed to that indictment has thus been rendered moot.

5. They were charged under 21 U.S.C. §§ 173 and 174 for offenses committed prior to May 1, 1971, and on and after that date, under 21 U.S.C. §§ 812, 841(a) (1), 841(b) (1) (A), 951(a) (1) and 952. §§ 173 and 174 were repealed, effective May 1, 1971, by § 1101(a) (2) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1291, but prosecutions for violations which occurred before that date were not affected. Pub.L. No. 91–513, § 1103(a), 84 Stat. 1294.

6. The petitioners do not dispute they can be subjected to prosecution for crimes committed in the United States subsequent

to the date of their extradition here. Although the current Southern District indictment alleges a conspiracy continued beyond October 6, 1971 (the date of their arrival in the United States under the extradition warrant) to January 4, 1972, when the indictment was returned, petitioners point to the fact that the two substantive charges against them allege acts in May 1970 prior to their arrival here and that the overt acts with which they are charged in the conspiracy count occurred in May 1970. Thus, they contend that the current Southern District indictment is merely a different version of the prior and superseded indictment which clearly charged an offense committed prior to their arrival in this country.

7. 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886).

tical evidence presented in the extradition proceedings.

The Court looked to the treaty itself,[8] and even in the absence of any restriction upon the demanding government, concluded "that the fair purpose of the treaty is, that the person shall be delivered up to be tried for that offence, [for which he was extradited] and for no other."[9] The Court pointed to the unarguable proposition that "the treaty [is] . . . the supreme law of the land, which the courts are bound to take judicial notice of, and to enforce in any appropriate proceeding the rights of persons growing out of that treaty . . . ."[10]

The underlying rationale of *Rauscher* is the obligation assumed by each contracting government under the treaty, the consequent rights in favor of the person ordered to stand trial in the demanding country, and the duty placed upon courts to enforce treaty obligations. *Rauscher* rests upon a concept that the demanding country is, under the treaty, bound in good faith not to prosecute the extraditee for other than the offense for which the extraditing country agreed to deliver him up for trial.[11] Where the demanding government fails to adhere to its commitment to try a person only for the offense for which he was extradited, the treaty deprives the court of jurisdiction to try him for any other offense.

■■ The petitioners urge that the *Rauscher* principle also be applied where extradition occurs under the principle of comity rather than pursuant to treaty. However, *Rauscher* is a recognized exception to the general rules of criminal jurisdiction because the defendant there was extradited under a treaty which foreclosed jurisdiction to try him for offenses other than the one for which he was extradited. His immunity from prosecution under other charges derived from the treaty. Without such a treaty or law, in the words of Ker v. Illinois,[12] decided the same day as *Rauscher*, the defendant is "clothed with no rights which a proceeding under the treaty could have given him."[13] Absent a treaty or law which limits jurisdiction, a court may try a defendant for any crime for which he has been properly indicted. And the means by which a defendant is brought before the court are immaterial[14] whether he was kidnapped by American agents in flagrant violation of another state's sovereignty,[15] or handed over by foreign agents who had not

---

8. Similarly, those authorities which have cited *Rauscher* have stressed its grounding in the treaty directly at issue in that case. *See, e. g.,* Johnson v. Browne, 205 U.S. 309, 317, 27 S.Ct. 539, 51 L.Ed. 816 (1907) ; Cosgrove v. Winney, 174 U.S. 64, 68, 19 S.Ct. 598, 43 L.Ed. 897 (1899) ; Lascalles v. Georgia, 148 U.S. 537, 542–543, 13 S.Ct. 687, 37 L.Ed. 549 (1893) ; Ker v. Illinois, 119 U.S. 436, 443, 7 S.Ct. 225, 30 L.Ed. 421 (1886) ; Autry v. Wiley, 440 F.2d 799, 801 (1st Cir.), cert. denied, 404 U.S. 886, 92 S.Ct. 219, 30 L.Ed.2d 169 (1971) ; Chandler v. United States, 171 F.2d 921 (1st Cir. 1948), cert. denied, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed 1081 (1949) ; United States v. Sobell, 142 F.Supp. 515, 524 (S.D.N.Y. 1956), aff'd 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957) ; 2 D. O'Connell, International Law 805 (1965). *But cf.* Ford v. United States, 273 U.S. 593, 615, 47 S.Ct. 531, 71 L.Ed. 793 (1927).

9. 119 U.S. at 423, 7 S.Ct. 242.

10. 119 U.S. at 419, 7 S.Ct. 240.

11. *Cf.* Ker v. Illinois, 119 U.S. 436, 443, 7 S.Ct. 225, 30 L.Ed. 421 (1886).

12. 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).

13. *Id.* at 443, 7 S.Ct. at 229.

14. *See* Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952) ; Ker v. Illinois, 119 U.S. 436, 443, 7 S.Ct. 225, 30 L.Ed. 421 (1886) ; United States v. Sobell, 142 F.Supp. 515, 523–525 (S.D. N.Y.1956), aff'd, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957).

15. *See* Ker v. Illinois, 119 U.S. 436, 7 S. Ct. 225, 30 L.Ed. 421 (1886) ; United States v. Unverzagt, 299 F. 1015 (W.D. Wash.1924), aff'd *sub nom.* Unverzagt v. Benn, 5 F.2d 492 (9th Cir.), cert. denied, 269 U.S. 566, 46 S.Ct. 24, 70 L.Ed. 415 (1925).

complied with the extradition treaty.[16] Violations of international law and acts allegedly constituting breaches of good faith where comity is involved are matters to be resolved by the political and executive branches of the respective governments.[17] Courts are without power to remedy breaches of commitments among nations which are not the subject of treaty obligations. In the instant case, with no treaty or law to rely on, any claim that prosecution of petitioners upon charges other than the one specifically referred to in the extradition warrant is in violation of its terms or is a breach of good faith owing from our government to the Italian government is a matter within the competence of the executive branches of both governments. It is not for the courts to interfere in such matters.[18]

Upon oral argument, the prosecution represented that the Italian government has already been requested to indicate it has no objection to the prosecution of Fiocconi and Kella on the current indictment, which, if forthcoming, would dispose of any claim that they could not be so tried [19] or that the Italian government considered such prosecution a breach of good faith. The facts surrounding petitioners' extradition proceedings in Italy suggest it is doubtful that any objection will be made by the Italian government in view of petitioners' clandestine presence in Italy, their conviction for using false passports, and that government's refusal to extradite one petitioner to France, his native country, where he was also wanted on a criminal charge in favor of extradition to the United States. The extradition was granted after a hearing upon the representation of our government that with respect to the Massachusetts indictment the amount of narcotics in which petitioners were trafficking was great and that there was "strong public opinion condemning drug traffic," also a crime and a problem in Italy. In the circumstances it is hardly likely that the Italian government would consider it a breach of faith by our government if the petitioners are tried for a crime similar to that for which extradition was granted or have any concern that petitioners are tried in the Southern District of New York instead of the District of Massachusetts.

Petitioners urge, however, that in fact our Court of Appeals in United States v. Paroutian [20] extended *Rauscher* to those instances where extradition occurred under the principle of comity rather than under treaty. They read too much into that decision. There, the defendant was extradited from Lebanon for "narcotics trafficking" to face trial in the Southern District of New York upon an indictment charging conspiracy to violate the narcotics laws, a copy of which, together with other evidence of the defendant's illegal activities, had been submitted to the Lebanese government. However, the defendant, upon his return here, was tried and convicted in the Eastern District of New York upon an indictment which included the core of the conspiracy count from the Southern District indictment, and in addition two substantive counts, receipt and concealment of heroin, which were the object of the conspiracy.

Petitioners here erroneously state that Paroutian was extradited from Lebanon according to comity rather than under

---

16. *See* United States v. Sobell, 142 F.Supp. 515, 523–525 (S.D.N.Y.1956), aff'd, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957) ; United States v. Insull, 8 F.Supp. 310 (N.D.Ill.1934).

17. *See* United States v. Sobell, 142 F. Supp. 515, 523 (S.D.N.Y.1956), aff'd, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957) ; United States v. Unverzagt, 299

F. 1015, 1017 (W.D.Wash.1924), aff'd *sub nom.* Unverzagt v. Benn, 5 F.2d 492 (9th Cir.), cert. denied, 269 U.S. 566, 46 S.Ct. 24, 70 L.Ed. 415 (1925).

18. *Cf.* Terlinden v. Ames, 184 U.S. 270, 290, 22 S.Ct. 484, 46 L.Ed. 534 (1902).

19. *See* United States ex rel. Donnelly v. Mulligan, 76 F.2d 511, 512–513 (2d Cir. 1935).

20. 299 F.2d 486 (2d Cir. 1962).

a treaty. Analysis of the record on appeal indicates otherwise—extradition was requested and effected under the extradition treaty between the United States and France, which both the United States and Lebanon agreed was binding upon them since Lebanon was a former French mandate.[21] Accordingly, the defendant, relying upon *Rauscher*, argued that his rights must be determined under that treaty, and having been extradited to face the Southern District indictment, he could not be tried for the different offenses set forth in the subsequently returned Eastern District indictment. In short, *Paroutian* centered about extradition under a treaty rather than under comity, and the issue posed to the Court of Appeals was whether the Lebanese would have considered Paroutian's prosecution upon the Eastern District charge different from trial upon the Southern District charge for which he had been extradited. The narrow holding of the court was that the Lebanese would not have so considered it since the defendant had been extradited to stand trial for trafficking in narcotics. The Court of Appeals was not called upon to consider whether the rights of a defendant extradited under comity were the same as those of one extradited under treaty, since both sides presented the case under the treaty and the *Rauscher* principle. It is true that the majority, in discussing *Rauscher*, stated it was based on "comity", but it is clear, in the light of the factual pattern, the term was used in a generic sense and not as a term of art.

■ However, even assuming that *Rauscher* should be extended to comity extraditions, there is an independent ground for denying this petition. The Extradition Convention of 1868 between Italy and the United States provides that "the person . . . delivered up for the crimes enumerated . . . shall in no case be tried for any . . . crime, *committed previously* to that for which his . . . surrender is asked."[22] Had petitioners been extradited under the treaty, they could have been tried on the current Southern District indictment since it charges offenses *committed subsequent to* rather than prior to those charged in the Massachusetts indictment which was the basis for extradition.[23] This clause represents the best indication of the conditions which regulate extradition between the two nations, and suggests that Italy would not consider the prosecution of the current Southern District indictment to be a violation of comity or an indication of bad faith. In any event, it would be anomalous for a defendant surrendered under comity and without any of the explicit protections of the treaty, to be in a more protected status than one surrendered under the treaty. Since Italy has consented to the prosecution of defendants for crimes committed subsequent to the commission of offenses forming the basis of extradition under the treaty, there would appear to be at least the same consent in the case of extradition under comity.

■ Finally, petitioners' reliance upon 18 U.S.C. section 3192, is misplaced, since it does not deprive the court of jurisdiction:

"§ 3192. PROTECTION OF ACCUSED

Whenever any person is delivered by any foreign government to an agent of the United States, for the purpose of being brought within the United States and tried for any offense of which he is duly accused, the President shall have power to take all necessary measures for the transportation and safekeeping of such accused person,

---

21. Appendix for Appellant at 11a, 13a; Appendix for Appellee at 1a.

22. 15 Stat. 631 (emphasis supplied).

23. Had the countries intended to preclude prosecution for all offenses committed *up to the date of extradition*, rather than for those committed *prior to the commission of the offenses* for which extradition is asked, the parties could have so provided by adopting one of the more standard treaty clauses. *See* 1 J. Moore, Extradition §§ 148–49, at 194–96 (1891).

and for his security against lawless violence, until the final conclusion of his trial for the offenses specified in the warrant of extradition, and until his final discharge from custody or imprisonment for or on account of such offenses, and for a reasonable time thereafter, and may employ such portion of the land or naval forces of the United States, or of the militia thereof, as may be necessary for the safekeeping and protection of the accused."

The statute by its own terms neither vests nor divests a court of jurisdiction to try an accused for the crime with which he has been charged.[24] Its basic purpose, as its title indicates, is to provide the use of our national resources including the military, for the physical protection of an accused who has been extradited to face a state or federal prosecution, during the pendency and disposition of the charges and for a reasonable time thereafter. It affords this protection whether the person has been extradited under treaty or comity. Under its terms petitioners will have government protection until the conclusion of their trials and discharge from custody or imprisonment, and for a reasonable time thereafter.[25]

The petition for a writ of habeas corpus is denied.

24. It is true that some decisions, including *Rauscher*, have interpreted the statute not only as providing physical protection for the extraditee but also as removing jurisdiction to try him for an offense other than the one for which he was extradited. *See, e. g.,* Johnson v. Browne, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907); Cosgrove v. Winney, 174 U.S. 64, 19 S. Ct. 598, 43 L.Ed. 897 (1899); In re Reinitz, 39 F. 204 (S.D.N.Y.1889). These cases, however, involved extradition under treaty; the statute should not be extended to remove jurisdiction to try a person who has been extradited under comity. The plain language of the statute does not suggest such an interpretation, and its history indicates that the provision only implements treaty commitments. Section 3192 was introduced in the Senate by Senator Trumbull as "a bill . . . further to provide for *giving effect to treaty stipulations* between this and foreign Governments for the extradition of criminals." Cong. Globe, 40th Cong., 3d Sess. 121 (1868) (emphasis added). It was adopted without amendment, Act of March 3, 1869, ch. 141, § 1, 15 Stat. 337; and codified with the same caption stressing its dependence on treaty commitments. Rev.Stat. § 5275. *See also* United States v. Rauscher, 119 U.S. 407, 423–424, 7 S.Ct. 234, 243, 30 L.Ed. 425 (1886) ("[this statute has] reference to all treaties of extradition made by the United States . . . ."); 1 J. Gould & G. Tucker, Notes on the Revised Statutes of the United States 986 (1889).

25. *Cf.* United States ex rel. Donnelly v. Mulligan, 76 F.2d 511, 512–513 (2d Cir. 1935).